| | | |
|---|---|---|
| **BAREFOOT ARCHITECT, INC.,** | : | **CIVIL ACTION** |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **NO. 04-99** |
| | : | |
| **SARAH BUNGE, et al.,** | : | |
| **Defendants** | : | |

# M E M O R A N D U M

**STENGEL, J.**

This case involves an architect, his clients, and the person they hired to replace him. The disagreement is over the alleged use of copyrighted architectural drawings, the misrepresentation of the conceptual contents of subsequent drawings, and non-payment for contracted services. The defendants have moved for summary judgment on all claims.[1] For the reasons that follow, I will grant the motions as to the federal claims and dismiss the pendent state law claim.

## I. BACKGROUND

### A. The beginning of the professional relationship between the Owners and Milne

In 1997, Village Vernacular (Village) was incorporated in the U.S. Virgin Islands by Glen E. Speer and two other individuals. (Statement of Undisputed Facts (SUF) ¶ 7.) The corporation's purpose was to "establish, maintain, and operate a building design, construction supervision and construction services company." (Id.) Mr. Speer was the

---

[1] The defendants filed four motions, each dealing with one count in the complaint.

majority shareholder in the corporation, and served as a director and as president. (Id. ¶¶ 9–10.) A. Michael Milne joined Village at a later date as an architect and served as its vice-president. (Id. ¶ 10.)

In May 1999, Sarah Bunge and Thomas Friedberg (the Owners) approached Village through Mr. Milne for architectural services. Bunge and Friedberg wanted Milne to design a vacation residence on certain property they owned at 168 Estate Chocolate Hole on St. John of the U.S. Virgin Islands. (Id. ¶ 11.) On May 15, 1999, Mr. Milne sent a Letter of Intent to the Owners. (Id. ¶ 12.) He encouraged them to start the design process so that the eventual product would capture the Owners' vision for their residence. (See Defs.' Mems. for Summ. J. Ex. 7 at 1–2.) Attached to the letter was a document describing the proposed architectural services. (Id. at ¶¶ 3–4.) It laid out a plan for full-scale representation by Milne, which would include preparing schematic designs, drafting construction documents, and administering actual construction. (Id.) To proceed with the project, the Owners were to sign the document and make an initial $1000 deposit. (Id.) On June 10, 1999, the owners executed the Letter of Intent and made the necessary deposit. (Id. ¶¶ 16–17.) All of these documents were prepared and executed on Village letterhead. (See Defs.' Mems. For Summ. J. Exs. 7–8.)

**B. Preliminary designs**

On August 31, 1999, Mr. Milne sent preliminary design sketches of the residence from a front elevation view and a top plan view. (SUF ¶ 19.) The drawings bore the

Village drawing legend.  (Id.; see Ex. 11.)  Over the course of the next few weeks, Milne

sent up to three sets of revised drawings to the Owners.  (SUF ¶¶ 20–22.)  Each

subsequent set was also prepared on paper bearing the Village drawing legend.  (Id.)  On

September 23, 1999, Milne prepared a Construction Cost Estimate and a Detailed

Preliminary Design Program Summary for the Project.  (Id. ¶ 23.)  These drawings

provided greater detail on the proposed buildings to be constructed, their dimensions, and

their exterior structures; they were also prepared on paper bearing the Village drawing

legend.  (Id.)

On October 5, 1999, Mr. Milne sent his first invoice to the Owners.  (Id. ¶ 27.)

The listed amount was $7650.00, which reflected $5992.50 for preliminary designs and

$1657.50 for the cost estimate.  (Id. ¶ 28.)  Milne noted the preliminary process had taken

longer than expected and explained that the size of this project had necessitated a great

deal of work.  (Id. ¶ 27.)  The Owners' initial $1000 deposit was credited towards this

amount, which left a bill for $6650.  (Id. ¶ 28.)  The Owners paid this full amount to

Village by check.  (Id. ¶¶ 31–32.)

With his first invoice, Milne included an itemized architectural service fee

estimate.  (Id. ¶ 29.)  He estimated 96 hours would be spent on the "conceptual phase."

(Id. ¶ 30.)  This would include site and plan diagrams, preliminary plans and elevations,

system analysis diagrams, and a preliminary construction cost estimate.  (Id.)  With

respect to the service fee estimate, Milne wrote,

I suspect that we will spend some time modifying the current proposed design and, as long as we are not significantly changing the design, I believe that the estimate is close to representing our involvement and services we intend to provide. This is an all inclusive number for the all [sic] architectural services as described for the current design including our efforts up to this point.

(Id. ¶ 33.) The total forecasted fee was $123,495.00, which was comprised of $107,855.00 for architectural services and $15,640.00 for construction administration. (Id. ¶ 35.)

On February 14, 2000, Milne sent more detailed architectural drawings of the Project. The specifics of the Project appeared to be taking shape as these drawings included elevation and plan views for a gate house, a guest house, and a beach bar in addition to the main residence. (Id. ¶ 42.) In April 2000, Milne submitted conceptual drawings for the Project to the permitting authority, the Virgin Islands Department of Planning and Natural Resources (VIDPNR). (Id. ¶ 70.) These drawings must have raised zoning questions at the VIDPNR regarding the multiple buildings to be placed on the property as well as their intended uses. (See Defs.' Ex. 25 (Milne Letter to VIDPNR).) On July 12, 2000, Milne was required to respond and address these issues. (See id.; SUF ¶ 43.)

At some point while Milne was creating, sharing, and finalizing his designs for the Freidberg-Bunge residence, he ceased to be employed with Village and began employment with Barefoot Architects. (SUF ¶ 45.) The exact date of this change is unclear. However, all payments for the Freidberg-Bunge designs throughout 1999 were

made to and deposited in the bank accounts of Village.  (Id. ¶¶ 40–41.)  The October 5, 1999 invoice and architectural service fee estimate, the February 14, 2000 architectural drawings, and the July 12, 2000 letter to the Virgin Islands Department of Planning and Natural Resources all bore Village Vernacular letterhead.  (Id. ¶¶ 29, 42, 43.)  The parties to the AIA Agreement entered into on August 31, 2000 described below are Friedberg, Bunge, and Barefoot Architect, Inc.  (Id. ¶ 47.)

The legal status of copyright interests in the Project is in dispute.  In any event, copyright interests were, at some point, transferred from Village to Barefoot.  While it was not until September 9, 2008 that an official Memorandum of Transfer of Copyright Ownership was executed, that agreement purports to memorialize an October 5, 1999 transfer of those rights from Village to Barefoot.  (Id. ¶¶ 178, 179.)

### C. The AIA Agreement

On August 31, 2000, Barefoot and the Owners executed a standard American Institute of Architects Agreement (AIA Agreement) for the architectural services to be provided for the Project.[2]  (Id. ¶ 36; see also Defs.' Ex. 23 (AIA Agreement).)  The AIA Agreement provided for two sets of services: basic and additional.  (AIA Agreement arts. 2–3.)  Basic Services consisted of five different phases: schematic design, design development, construction document, bidding or negotiation, and construction phase-administration of the construction contract.  (Id. art. 2; SUF ¶ 50.)

---

[2] This agreement replaced any prior contractual agreements or understanding between the parties.

## 1. Basic Services

Article 2 describes the scope of the basic services. It envisions a close working relationship between the architect and the owner. After discussing the owner's requirements, the architect is to draw up preliminary evaluations, schedules, and budget estimates for the contracted project. (AIA Agreement arts. 2.2.1, 2.2.2.) The architect is then to review these documents with the owner until a mutually agreed-upon plan can be devised. (Id. arts. 2.2.3–2.2.5.) The importance of this back-and-forth approval process can be seen in the agreement's sections relating to decisions regarding design development and finalization, construction budgeting and cost estimates, and construction bidding and contracting. (See id. arts. 2.3.1–2.3.2, 2.4.1, 2.4.3, 2.5.)

## 2. Additional Services

Article 3 describes the types of services not included in basic services. These include services such as drawing revisions necessitated by inconsistent instructions or approvals by the owner, subsequent changes in applicable law, or by the owner's failure to make timely decisions (id. art. 3.3.1), and providing services in connection with related public hearings or other legal proceedings (id. art 3.3.8). Before commencing these and other services described in Article 3.3, the architect must notify the owner and give him or her an opportunity to reject.

Another branch of services described in Articles 3.2 and 3.4 may only be provided if authorized or confirmed by the owner in writing. (See id. art. 3.1.1.) These services

include, *inter alia*, providing greater representation at the construction worksite than had been provided under Article 2 (id. art. 3.2.1), providing financial feasibility studies (id. art. 3.4.2), providing detailed estimates of construction costs (id. art. 3.4.10), and providing services more than sixty days after the date of substantial completion of the project (id. art. 3.4.18).

### 3. Reimbursable expenses

Another set of services (and expenses) falling outside the umbrella of basic services is described in Article 10. The architect's performance of these services can be separately charged to the owner. They include fees paid for securing approval of the proper regulating bodies; reproducing, plotting, and delivering instruments; creating models and mock-ups as requested by the owner; and other similar direct project-related expenses. (Id. arts. 10.2.2, 10.2.3, 10.2.5, 10.2.8.)

### 4. Owner's use of the architect's instruments

The scope of the owner's permitted use of the architect's instruments of service is outlined in Article 6. The term "instruments of service" is described as the drawings, specifications, and other documents, both in print and electronic form, prepared by the architect or the architect's consultants. (Id. art. 6.1.) The owner is granted a nonexclusive license to reproduce the instruments of service for the purposes of constructing, using and maintaining the Project. (Id. art. 6.2.) Such license is valid so long as the owner complies with all obligations under the agreement. (Id.) The architect

retains all common law and statutory rights, including copyrights, relating to the instruments.  (Id. art. 6.1.)

The license is terminated if the agreement is terminated prior to completion of the project.  (Id. art. 6.2.)  Termination of the agreement itself must be preceded by any one of a series of possible termination events.  (See generally id. art. 8 (discussing terminating the agreement).)  These include failure to make payments under the agreement, suspension of services for at least 90 consecutive days, and substantial nonperformance.  (Id. arts. 8.2–8.4.)  After a triggering event has occurred, the terminating party must provide seven days' written notice of the intent to terminate the agreement.  (Id.)  Usually, the party wishing to terminate must not be at fault for the termination event.  (Id.)  Services may also be terminated without cause by the owner upon seven days' written notice.  (Id. art. 8.5)

### 5. Compensation

The compensation for basic services was set at $123,495.00.  (Id. art. 11.2.1; SUF ¶ 36.)  5% of this amount was attributed to the schematic design phase; 15%, design development phase; 25%, construction documents phase; 2%, building or negotiation phase; and 13%, construction phase.  (AIA Agreement art. 11.2.2.)  The compensation for project representation beyond the scope of basic services (as described in Article 3.2) was set at $85 per hour.  (Id. art. 11.3.1.)  The parties disagree as to whether this same rate of

compensation applies to other additional services provided in Article 3.  (See id. art. 11.3.2 (providing no basis of compensation for such services); see also SUF ¶ 262.)

### D. The payment dispute

It is undisputed that the agreed-upon fee for Basic Services was $123,495.00. (SUF ¶ 36.)  There is also no dispute that by June 7, 2001, the Owners had paid Barefoot at least $123,495 and that by July 13, 2001, the amount paid to Barefoot totaled $171,485.05.[3]  (Id. ¶¶ 76, 78.)  In addition to this sum already paid, Barefoot claims an additional $233,708.38 for unpaid services provided.  (Id. ¶ 93.)

The first dispute regarding this alleged unpaid sum arose as early as June 6, 2001. In a letter to the Owners, Milne alludes to a discussion on how the amount due by Owners is being calculated on the invoices.  (See Defs.' Ex. 33 (June 6, 2001 letter from Milne to Owners).)  That particular invoice showed $51,318.75 of unpaid Contingent Additional Services and $47,363.80 in Basic Architectural Services.  (Id.)  On June 7, 2001, the Owners paid the amount owing for the Basic Architectural Services but not for the Contingent Additional Services.  (SUF ¶ 75.)

_____

[3] Although no specific calculation separating out which payments were made for which services, the parties agree on the following dates of payment and amounts:

| May 15, 1999 | $1000.00 |
| October 15, 1999 | $6650.00 |
| May 11, 2000 | $25,051.25 |
| June 7, 2001 | $47,363.80 |
| July 5, 2001 | $10,000.00 |
| July 13, 2001 | $30,000.00 |
| Total | $171,485.05 |

(SUF ¶ 75.)

On July 1, 2001, Milne sent another letter explaining in greater detail why certain amounts were being charged separately and still owing under the AIA Agreement. First, he admitted he had underestimated the amount of work that would be involved in providing basic services. (Id. ¶ 77.) The total cost of basic services performed to that date was $94,605.00, which represents 1113 hours of work at $85 per hour. (Id.) This sum itself reflected a sizable discount of $98,961.25, an amount for services already incurred but for which Milne agreed not to charge. (Id.) The Owners made two final payments on July 5, 2001, and July 13, 2001, of $10,000 and $30,000, respectively. (Id. ¶ 79.)

On September 15, 2001, Barefoot (through Milne) requested $18,593.75 for construction administration services and additional reimbursable expenses incurred before July 18, 2001, and $12,421.70 for the same types of services performed between July 19 and August 15, 2001. (Id. ¶ 80.) The Owners made no further payment.

On October 3, 2001, Barefoot sent an invoice for construction administration, additional services, and reimbursable expenses totaling $51,050.70 incurred from April 13 to September 26, 2001. (Id. ¶ 82.) The next day, the Owners responded to Barefoot. Although the text of the letter has not been provided, its general tone can be fairly determined from Barefoot's reply:

> Your letter of October 4 has changed the tone of our relationship and caused me to reconsider the project. It is clear that you no longer perceive our role as helpful or as valuable as when we began this project.

   *  *  *

> I have no choice except to provide you with notice that the failure to
> make payments in accordance with the AIA Agreement, Article 8.1,
> and deductions made from the architect's compensation, Article 10.5,
> represent substantial nonperformance on your part and cause for
> suspension of architectural services. Under the terms of the agreement,
> we are providing you with seven days written notice of such
> suspension. If the unpaid invoices are not resolved within 90 days of
> service suspension, then the agreement shall be terminated.

(Defs.' Ex. 39 (October 6, 2001 letter from Milne to Owners) at 1.)

  Five days later on October 11, 2001, Barefoot sent another letter to the Owners

addressing the billing discrepancies originally identified in their October 4, 2001

response. (Defs.' Ex. 40 (October 11, 2001 letter from Milne to Owners).) This letter

makes several points regarding the invoice structure and what services are Basic Services

and which are Additional Services. The additional work on the construction documents,

which were submitted to the VIDPNR for review on August 3, 2001, was properly

considered as additional services under Article 3. Any construction administration

services provided before the date on which the construction contract was executed (in

addition to any post-execution administration services not associated with the

construction documents) are considered additional services under Article 2.6. Time spent

making owner-directed design revisions necessitated by inconsistencies with the owner's

prior instructions and approvals were to be separately charged as additional services

under Article 3.3.1. Finally, the time spent preparing construction models is an

independently reimbursable expense under Article 10.2.1.5 and did not fall in the AIA Agreement's basic service provisions.  (See id.)

On November 8, 2001, Barefoot sent another letter to the Owners informing them that any additional services would be provided under Article 11.3.1 of the Agreement because the period for Basic Architectural Services had closed.  (See Defs.' Ex. 41 (November 8, 2001 letter from Milne to Owners).)  Barefoot attached a revised invoice reflecting unpaid fees for additional services under the agreement: $233,708.38.  This amount increased the total amount charged by Barefoot during the duration of the project to $405,193.43 in services.  Payment of this amount would effectively increase the Owners' bill to $281,698.43 over the originally contracted $123,495.00.  (SUF ¶ 93.)

To date, the total sum paid by the Owners is $171,485.05.  This represents the Basic Service Fee in addition to $47,990.05 in Additional Services.  Still owing is $233,708.38.

This letter also contained a renewed threat to terminate the agreement.  It stated,

> Your failure to make payment of this invoice within thirty (30 days of this letter shall be considered substantial nonperformance and cause for termination of the agreement, pursuant of Article 8 of the AIA Agreement.  If required, I shall then provide you with written notice of termination of services after seven (7) days.

(Defs.' Ex. 41.)  Another letter making the same threat of termination upon proper notice was dated November 26, 2001.  (SUF ¶ 97.)  The record reveals no actual letter of termination was ever sent by either party.

### E. Separation and re-design

On December 6, 2001, Robert L. Kenny, Esq., sent a letter to Barefoot in his capacity as attorney for the Owners stating that the Owners considered Barefoot to be in breach of the contract. (SUF ¶ 98.) While the letter did not declare that the Agreement was being terminated, it advised Milne (as Barefoot's agent) to submit revised construction plans to the VIDPNR per the contract and to desist from making disparaging remarks to third parties such as the VIDPNR or the Owners' bank. Defs. Ex. 43 (December 6, 2001 letter from Robert Kenny to Milne.) In response, Barefoot sent letters to the Owners and to Kenny indicating the firm was electing to suspend its services under the Agreement. (SUF ¶ 100.) There was no notice of termination, and Barefoot formally suspended services on December 18, 2001. (Id.)

Under its reading of the Agreement, Barefoot believed the Owners were no longer entitled to use the Instruments of Service. (Defs.' Ex. 47 (Barefoot's AIA Ethics Complaint) at P10684; see also SUF ¶ 105) Though asked to return any copies of the Instruments of Service in their possession, the Owners refused to do so. (Id.)

After Barefoot suspended its services, the Owners sought and retained a new architect to complete the Project: Theresa Roberts of Springline Architects. (See SUF ¶¶ 108, 115.) This relationship was further formalized when Ms. Roberts sent a letter notifying the VIDPNR she would be the Architect of Record for the Project. (SUF ¶ 109.) In that capacity, Roberts indicated she would submit new drawings for review and

provide information on an on-going basis so as to allow construction to continue.  (Defs.'
Ex. 48 (letter from Theresa Roberts to VIDPNR).)

Before starting work on the Project, Roberts ordered as-built surveys of the site to
be taken.  (SUF ¶ 110.)  This was necessary because construction had already begun on
the site and the proposed buildings were at various stages of completion.  Indeed,
substantial construction on the gate house, garage, and beach pavilion had already been
completed by June 2002.  (SUF ¶¶ 119–121.)  Extensive excavation of the site was
completed as well, and a substantial part of the foundation and lower level cistern of the
main house were in place.  (Id. ¶¶ 122–123, 125.)  Needless to say, Roberts was not
beginning her design from scratch.  (Id. ¶ 117.)  In December 2002, Roberts submitted
her new permit drawings and the as-built surveys both to the Owners and the Virgin
Islands Coastal Zoning Management for permitting purposes.  (Id. ¶¶ 111–112.)

### F. The current suit

Barefoot filed its complaint in 2004 and named the Owners, Theresa Roberts, and
Springline as defendants.  The complaint consists of three counts.  Count I is against all
defendants and alleges copyright infringement.  More specifically, the Owners are alleged
to have violated the scope of their non-exclusive license to use the instruments, and
Roberts and Springline allegedly copied the instruments Barefoot prepared for the
Project.  Count II is a Lanham Act claim against Roberts and Springline alleging that they
created a false designation of origin by placing their own names on their instruments,

which are substantially copied from Barefoot's instruments. Count III is a breach of contract claim against the Owners. The defendants have moved for summary judgment on all counts.

## II. STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). An issue is "genuine" when a reasonable jury could return a verdict for the non-moving party based on the evidence in the record. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" when it could affect the outcome of the case under the governing law. Id. A party seeking summary judgment initially bears responsibility for informing the court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial Celotex burden can be met simply by demonstrating "to the district court that there is an absence of evidence to support the non-moving party's case." Celotex, 477 U.S. at 325. After the moving party has met its initial burden, "the adverse party's response, by affidavits or otherwise as provided in this

rule, must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). Summary judgment is therefore appropriate when the non-moving party fails to rebut by making a factual showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

Under Rule 56 of the Federal Rules of Civil Procedure, the court must view the evidence in the record in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. Anderson, 477 U.S. at 255. The court must decide not whether the evidence unmistakably favors one side or the other, but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. Id. at 252. If the non-moving party has produced more than a "mere scintilla of evidence" demonstrating a genuine issue of material fact, then the court may not credit the moving party's version of events against the opponent, even if the quantity of the moving party's evidence far outweighs that of its opponent. Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).


## III. DISCUSSION

### A. The copyright infringement claim

Count I alleges the defendants violated Barefoot's copyright interests in the Instruments of Service by using them without proper authorization. More specifically,

Barefoot alleges the Owners exceeded the scope of their non-exclusive license by failing to receive authorization before making and distributing copies of the instruments; Roberts and Springline are alleged to have unlawfully copied the copyrighted designs in the instruments when preparing their own drawings.

Before addressing the substance of Barefoot's claims, it is first  necessary to first consider whether Barefoot has standing to bring its claims.  I will dismiss this claim because Barefoot has not adequately demonstrated it is the proper owner of the copyright interests in question.

### 1. The plaintiff lacks standing for copyright infringement

It is well-settled that architectural plans are subject to copyright protection, per 17 U.S.C. § 102(a)(5) and (8).  See also UNITED STATES COPYRIGHT OFFICE, COPYRIGHT CLAIMS IN ARCHITECTURAL WORKS (available at http://www.copyright.gov/circs/ circ41.pdf).  To bring an action for alleged infringement of an architectural copyright interest, the plaintiff must have been "[t]he legal or beneficial owner of an exclusive right" under the copyright at the time of the alleged infringement."  17 U.S.C. § 501(b).

Generally, copyright interest in a work initially vests in the author (or authors) of that work.  Id. § 201(a).  This assumes the creator of the work operated independently in producing the product.  In the case of a work made for hire, the interest will vest in the employer or other individual for whom the work is prepared.  Id. § 201(b); see also May v. Morganelli-Heumann & Assocs., 618 F.2d 1363, 1368 (9th Cir. 1980) ("Under the

'works for hire' doctrine, when an employer hires an employee . . . to produce work of an artistic nature, the courts will presume in the absence of contrary proof that the parties expected the employer to own the copyright . . . ."). Even though the employee may have been the actual physical creator, his or her employer will control the rights to subsequent copying and usage of the work.

In determining whether the works-for-hire doctrine applies, courts look at a host of different factors to plumb the depths of the relationship between the author and the hiring party. These include whether the hiring party has the right to control the manner and means in which the work is prepared, the control over the details of the work, the hired party's occupation and the skill required for the work, local custom, length of employment, work location, payment method, the regular business of the hiring party, the parties' understanding, tax treatment, employee benefits, and whether the hiring party is in business. See Marco v. Accent Publ'g Co., Inc., 969 F.2d 1547, 1550 (3d Cir. 1992). The facts here indicate this was a work-for-hire situation, vesting initial ownership of the copyright interests in Village. There is no need to engage in the exacting analysis suggested in Marco because there is no dispute Milne was working as a Village architect and serving as the company's vice-president. (See, e.g., SUF ¶¶ 10, 11, 12, 15, 19, 24 (stating Milne was the vice president at Village, was a Village employee during the beginning stages of the Project, and prepared drawings and memoranda on Village letterhead).) In either capacity, Milne was undoubtedly a corporate employee, a fact

which Barefoot does not deny.  (See SUF ¶¶ 11, 24 (stating Milne was a Village employee).)

### a. Transferring copyright interests

A copyright holder is not compelled to hold his or her interest in perpetuity. Rather, the Copyright Act specifically provides for the subsequent transfer of such interests via "any means of conveyance or by operation of law." 17 U.S.C. § 201(d). When the transfer is not by operation of law, section 204(a) specifically provides that such "[a] transfer of copyright ownership . . . is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent."  17 U.S.C. § 204(a).

Though compared to the statute of frauds, the writing requirement in Section 204 is inherently different.  An agreement subject to the statute of frauds may be valid yet unenforceable if not reduced to a writing; an attempt to transfer a copyright interest without a Section 204 writing is not valid.  Konigsberg Int'l, Inc. v. Rice, 16 F.3d 355, 357 (9th Cir. 1994).  The writing requirement serves the dual goals of protecting authors from fraudulent claims and enhancing the predictability and certainty of copyright ownership.  Id. (quoting Effects Assocs. v. Cohen, 908 F.2d 555, 557 (9th Cir. 1990)).

The transfer agreement "doesn't have to be a Magna Carta; a one-line pro forma statement will do."  Effects Assocs. v. Cohen, 908 F.2d 555, 557 (9th Cir. 1990).  Though

no magic words are required, the language must clearly indicate an agreement to transfer copyright.  Lyrrick Studios, Inc. v. Big Idea Productions, Inc., 420 F.3d 388, 392 (5th Cir. 2005).  Whether a writing was sufficient for the purposes of § 204(a) is a question of law. Konigsberg Int'l, 16 F.3d at 356.

### i. Was the writing legally sufficient?

The defendants' first argument is that the Memorandum of Transfer (Memorandum) failed to ratify the alleged oral agreement because of the intervening nine year gap.  (See Mem. for Summ. J. on Standing at 10–12.)  They contend that the writing must at least be contemporaneous to serve the purposes of § 204(a).  (Id. (citing Konigsberg Int'l v. Rice, 16 F.3d 355, 357 (9th Cir. 1994)).

This question has not been addressed by courts in this circuit.  I believe the Second Circuit's decision in Eden Toys, Inc. v. Florelee Undergarment Co., 697 F.2d 27 (2d Cir. 1982), is instructive.  One of the issues considered in Eden Toys was whether an oral exclusive licensing agreement memorialized in a writing several years later is valid as of the time of the oral agreement or the execution of the writing.  Id. at 36.  Though the court ultimately remanded this issue for further proceedings to determine whether such an oral agreement actually existed, it held, as a matter of law, that Section 204 does not require the writing and oral transfer to be completed at the same time.  Id.  Because the purpose of Section 204 is "to protect copyright holders from persons mistakenly or fraudulently claiming oral licenses," even a later executed writing can confirm a transfer agreement.

<u>Id.</u>; <u>see also</u> <u>Billy-Bob Teeth, Inc. v. Novelty, Inc.</u>, 329 F.3d 586, 591–92 (7th Cir. 2003)

("[A]n oral assignment may be confirmed later in writing."); <u>Imperial Residential Design,</u>

<u>Inc. v. Palms Development Group, Inc.</u>, 70 F.3d 96, 99–100 (11th Cir. 1995) (adopting

the reasoning in <u>Eden Toys</u> that "a copyright owner's later execution of a writing which

confirms an earlier oral agreement validates the transfer *ab initio*."); <u>Tacori Enterprises v.</u>

<u>Rego Mfg.</u>, 2008 WL 4426343, at *11 (N.D. Ohio Sept. 25, 2008) (same).

In light of the purposes of establishing certainty and preventing fraud in copyright

transfers, courts have generally been more lax on expecting the writing to be completed at

or soon after the transfer where the transferor and transferee agree that a valid agreement

exists.  <u>Lyric Studios v. Big Idea Productions, Inc.</u>, 420 F.3d 388, 393–94 (5th Cir.

2005) (citing numerous cases where courts have been reluctant to find post-deal writings

insufficient); <u>Arthur Rutenburg Homes, Inc. v. Drew Homes, Inc.</u>, 29 F.3d 1529, 1532–33

(11th Cir. 1994) (finding that where an oral agreement of transfer was made in 1988 and a

formal memo of conveyance was executed in 1990, the transferee held the copyright as of

the date of the preceding oral transfer, and citing supporting case law from the Ninth

Circuit and federal district courts in Tennessee and New York); <u>see, e.g.</u>, <u>Kaplan Co., Inc.</u>

<u>v. Panaria Int'l, Inc.</u>, 1998 WL 603225, at *2 (S.D.N.Y. Sept. 11, 1998) (finding that the

writing requirement of Section 204 was satisfied by a writing executed thirteen years after

the underlying transfer agreement).  This makes sense since the dangers of inadvertent

transfer or fraud are significantly diminished in such a situation.

On the other hand, where the parties to a purported transfer agreement disagree as to whether any transfer actually took place, courts will carefully analyze the presented facts to determine whether the writing is satisfactory, both in language and in time. See Lyrick Studios, 420 F.3d at 394. Two cases from the Ninth Circuit illustrate this dichotomy. In Konigsberg Int'l v. Rice, 16 F.3d 355 (9th Cir. 1994), the Ninth Circuit considered a dispute between the author Anne Rice and two producers as to whether a transfer of television and movie option rights to one of Ms. Rice's novels had occurred. Id. at 356. After a case in federal court was dismissed for lack of a writing memorializing the alleged transfer, Ms. Rice "tried to vindicate her position" by writing a "somewhat indignant letter" that included an allusion to the alleged transfer. Id. With the author's letter in hand and believing they now had a writing sufficient for the purposes of §204, the producers returned to federal court and filed a motion for reconsideration.

The Ninth Circuit disagreed. First, the letter was "written three and a half years after the alleged oral agreement, a year and a half after its alleged term would have expired, and 6 months into a contentious lawsuit." Id. at 357. In the court's view, this was not substantially contemporaneous. See also Fleming v. Miles, 181 F. Supp. 2d 1143, 1158 (D. Or. 2001) (failing to make a final ruling on the Section 204 question, but providing the preliminary conclusion that a writing "executed almost three years after the alleged agreement, after almost a year of litigation, and one day before [the opposing party] filed his reply brief in support of his motion for summary judgment" was not

retroactively ratified.); id. Second, the letter was not a product of the parties' negotiation and "came far too late to provide any reference points for the parties' license dispute." Konigsberg, 16 F.3d at 357.

In a later case, the Ninth Circuit found an after-executed writing to be sufficient where the facts indicated the transferor and transferee agreed to the transfer itself. In Magnuson v. Video Yesteryear, 85 F.3d 1424 (9th Cir. 1996), the court recognized the plaintiff-appellee's standing as the real party in interest in a copyright infringement case where a memorandum of transfer was executed fourteen years after the oral agreement. Id. at 1427–29. Noting the long gap in time between the oral agreement and the writing, the court distinguished the case from Konigsberg by characterizing the dispositive issue in that case as the fact that the produced writing was "not the *type* of writing contemplated by section 204 because it came far too late to provide any reference point for the parties' license disputes." Id. at 1429 n.1 (quoting Konigsberg, 16 F.3d at 357) (internal quotation marks omitted). It "did not directly acknowledge that a transfer had occurred or indicate any specific terms." Id.

Perhaps the most important distinction was that there was an actual dispute between the transferor and transferee in Konigsberg, which presumably made the court warier of accepting the purported writing. In Magnuson, however, the court noted "there [was] no dispute between the transferor and the transferee concerning whether the transfer actually occurred, or the terms on which it occurred." Id.; see also Fleming, 181

F. Supp. 2d at 1158 (distinguishing <u>Magnuson</u> from <u>Konigsberg</u> by noting that in the former, "the defendant was a stranger [to the transfer] and there was no dispute between the alleged transferor and transferee, nor did the lawfulness of the alleged infringer's conduct depend on the validity of the assignment. Although the writing requirement itself does not require the use of special language to confirm the transfer, the omission of key terms and the failure to reference the alleged oral agreement weighed against the document produced in that case.

There is no dispute that the 2008 writing in this case purports to memorialize a putative oral transfer agreement made nine years before. This delay likely adds strength to the defendants' argument to deny the writing because it was not contemporaneously executed. What is more important is the apparent lack of disagreement between the transferor and the transferee—Village and Barefoot—regarding the writing or its terms. Speer and Milne, as the parties signing on behalf of their respective companies, agree it was intended to transfer any and all copyright rights in the Project from Village to Barefoot in 2008.

### ii. Is the October 5, 1999 oral agreement enforceable?

Barefoot has failed to establish that the 1999 "oral agreement" was ever made. There is no evidence save for the memorandum of transfer. The document only represents itself as a memorialization of the October 5, 1999 assignment of all intellectual property interests and rights. (<u>See</u> Ex. 55.) If there was no agreement in 1999, there was nothing

to memorialize in 2008.  Therefore, the basic question is whether there was an agreement of transfer in 1999.

For a contract to be valid under Virgin Islands law, there must be "a bargain in which there is a manifestation of mutual assent to the exchange and consideration."  <u>Univ. of the Virgin Islands v. Petersen-Springer</u>, 232 F. Supp. 2d 462, 469 (D.V.I. 2002); <u>see also</u> Restatement (Second) of Contracts § 17 (1981).  Without mutual assent, there can be no contract.  In other words, all parties to the proposed contract must "either make a promise or begin or render a performance."  Restatement § 18.

There was no manifestation of mutual assent by either Barefoot or Village (through Speer) because there is no evidence that the alleged oral agreement ever occurred.  Rather than supporting Barefoot's claim of an alleged oral agreement, the record undermines it.  In responding to the defendants' Statement of Undisputed Facts, Barefoot has openly acknowledged the following: "Mr. Speer never assigned any copyright in the Friedberg-Bunge Residence project to Barefoot Architect or Mr. Milne," and  "Mr. Speer never had a conversation with Mr. Milne about the copyright in the Friedberg-Bunge Resident project."   (SUF ¶ 182; <u>see also</u> Speer Tr., 34; SUF ¶ 183.)  The importance of these admissions is immediately apparent because they wholly contradict the position that an oral transfer occurred in 1999.  If copyright ownership is necessary for raising a copyright claim and Barefoot's alleged ownership relies on an oral transfer agreement, admitting that one of the alleged contracting parties never engaged in

such discussions is self-defeating. Speer's belief the Project was a Village project provides Barefoot no support. During his deposition, Speer was asked several times about the alleged 1999 transfer of the Project to Barefoot. Each time he stated no such conversation took place and he believed there was no issue because he did not consider the Project to be a part of Village.

Without an oral agreement, the writing can validate a transfer on a going-forward basis only. The writing does not reach backward and validate any transfer of rights or interests because there is no such prior transfer. Cf. 17 U.S.C. § 204 (stating that transfer of ownership, other than by operation of law, "is not valid unless an instrument of conveyance, or a note or memorandum of transfer" is executed); Arthur Rutenberg Homes, Inc. v. Drew Homes, Inc., 29 F.3d 1529, 1532–33 (11th Cir. 1994) (holding that the appellant was the valid copyright owner at the time of infringement, which occurred after an oral transfer agreement was made but before the memorandum memorializing the transfer was drafted); Eden Toys, 697 F.2d at 36 (holding that the "note or memorandum requirement" can be satisfied by a later writing executed after an oral agreement); Rottlund Co., Inc. v. Pinnacle Corp., 2004 WL 1879983, at *10 n.15 (D. Minn. Aug. 20, 2004) ("[Plaintiff] already *owned* all the . . . copyrights, but needed a writing signed by [the transferor] for the *Copyright Act* to recognize its ownership.").

Whatever Speer may have thought about Village's copyright ownership interests with respect to the Project, those beliefs are firmly contradicted by case law. Generally

speaking, the author of a work is the copyright holder, but where the work is for hire, "the employer or other person for whom the work is prepared is considered the author and owns the copyright." Community for Creative Non-Violence v. Reid, 490 U.S. 730, 737 (1989) (internal quotation marks omitted). From Speer's point of view, the Project was being conducted by Milne independently even though at the time he worked on it, Milne was employed by Village, several Village employees worked on it with Milne, all payments were made to Village, and all drawings and other documents were made on Village letterhead or identified Village as the architectural firm. The Project was a Village project. There is no evidence that Village and Barefoot had an agreement, oral or otherwise, for the transfer of copyright interests in the Project in 1999.

### B. Lanham Act claim

I will grant the motion as to the Lanham Act claim. This claim alleges Roberts and Springline provided a "false designation of origin" by submitting drawings alleged to be substantially similar to those prepared by Barefoot and placing their own names on them. I believe this argument is foreclosed by the Supreme Court's ruling in Dastar Corp. v. Twentieth Century Fox Film Corp., 539 U.S. 23 (2003).

The Lanham Act bars the use of a "false or misleading description of fact, or false or misleading representation of fact" in connection with the sale of goods in interstate commerce. Sandoz Pharm. Corp. v. Richardson-Vicks, Inc., 902 F.2d 222, 227 (3d Cir. 1990) (quoting Trademark Law Revision Act, Pub. L. No. 100-667, § 132, 102 Stat. 3946

(1988)).  Section 43(a) provides a cause of action for any false or misleading descriptions

or representations of a product, which may include statements regarding the origin of a

particular product.  15 U.S.C. § 1125(a); United States Healthcare v. Blue Cross of

Greater Phila., 898 F.2d 914, 921 (3d Cir. 1990).

The bar on the false designation of origin is intended to protect competitors and

consumers from unfair competition through confusion or damage to a producer's

goodwill.  A common example, which is directly applicable here, is the reverse passing-

off violation.  Under this theory, an individual or entity provides a false designation of

origin when it markets, advertises, or otherwise represents a competitor's product as its

own.[4]  The example provided in Dastar of such a violation is if Coca-Cola offered a Pepsi

beverage as its own product.  PepsiCo would be the true origin of a Pepsi beverage, and

Coca-Cola's attempt to sell or market that product as its own would be a falsification of

who produced the item.

In essence, this is Barefoot's claim.  Roberts and Springline submitted

architectural drawings bearing their names to the VIDPNR and other contractors.  These

documents also stated that all information therein contained—"[t]he concepts, ideas,

designs and details as shown"—was the property of Springline.  (Compl. ¶ 35.)  As

alleged in its copyright infringement claim, Barefoot believes the Springline drawings are

_____

[4] Under the "passing off" theory, an entity instead misleads consumers by passing off its
goods as those of another to trade on the goodwill built up in the name and mark of the other.
See 4 McCarthy on Trademarks and Unfair Competition § 25:1 (4th Ed.)

substantially similar to its own and the final construction of the Project would be substantially similar to the design it created.  (Id. ¶ 56.)  Consequently, as Barefoot frames it, the alleged use of certain elements and drawings drawn from Barefoot's instruments is a false designation of the origin of those components.

Although the claim here seems like a reverse passing-off claim, it is fundamentally different because it draws a finer distinction to the definition of "origin."  The Court's Coke-Pepsi example is a simple enough to understand because it implicates a tangible product only in its entirety.  We are not concerned with who produced all the constituent parts that go into a bottle of Pepsi.  We care only about the product itself and whether a competitor has attempted to mislead the purchasing public as to the identity of the source.

Barefoot's argument goes a step further.  Because there is no allegation Roberts or Springline simply copied and resubmitted Barefoot's Instruments, the claim that substantial similarity between the sets of instruments provides the basis for a false designation of origin claim.  Therefore, the court must engage in a more detailed consideration of the component parts of the instruments.  This begs the question of whether the Lanham Act is broad enough to provide protection for the communicative contents of a product or whether it protects just the product itself?

The Supreme Court addressed this issue in Dastar Corp. v. Twentieth Century Fox Film Corp., 539 U.S. 23 (2003).  In that case, Dastar had produced a World War II video series by buying, copying and slightly editing the tapes of an existing series, which had

been produced years earlier by Twentieth Century Fox. At this time, the copyright

production on the Fox tapes had expired, placing the production in the public domain.

Dastar added no new footage and simply revised and reused the existing Fox product.

The final product made no mention or reference to Fox or the original series. I only

identified Dastar and one of its subsidiaries as the producers and distributors of the series.

Despite the copyright expiration, Twentieth Century Fox argued the Lanham Act

should be interpreted to provide a cause of action for the "misrepresentation of authorship

of noncopyrighted works." Id. at 35. The Court disagreed. The origin of the videos in

question was Dastar as it was the source of the product. That a product or good contained

certain ideas or communications attributable to another individual or entity did not alter

the Court's analysis. "Origin," as used in the Lanham Act, did not extend so far as to

include the creators of underlying work incorporated into a final product. Though certain

products, such as books or videos, possess value in their contents (which may have

various points of origin), the Lanham Act is limited to the producers of tangible goods for

sale. Consequently, Fox's claim failed because Dastar was the origin of the goods in

question even though it had relied on Fox' product in producing them.

Dastar's holding has been extended to architectural drawings as well. See, e.g.,

HRH Architects, Inc. v. Lansing, 2009 WL 1421217, at *2–4 (N.D. Ga. Apr. 22, 2009)

(finding that a Lanham Act claim based on an allegedly improper use of the pictures of

certain architectural works fails as a matter of law); Francois v. Jack Ruch Quality

Homes, Inc., 2006 WL 2361892 (C.D. Ill. Aug. 14, 2006) (dismissing a Lanham Act claim where the plaintiff alleged the defendant's copying, revising, and use of plaintiff's architectural plans without any attribution).

I believe the decision in Francois v. Jack Ruch Quality Homes, Inc. is especially persuasive as its facts are similar to those here. Francois was an architect who entered into an oral agreement to design an office building for a client. Preliminary cost estimates indicated the building could be completed for around $444,000. After several months of planning and design, Francois completed the construction documents, which bore his firm's label and his architect's licensure seal.

With the plans completed, Francois and his client prepared to solicit bids from contractors. Before the bidding was opened, one of the contractors, Jack Ruch Quality Homes (JRQH), contacted the client by letter and stated he believed the building could be built at a substantially lower cost with certain changes and be easily completed in a reasonable amount of time.

After the bid deadline passed and the bids were opened, the client was allegedly upset at the high prospective costs. The lowest bid was $569,000, which was approximately $125,000 more than the preliminary estimates. Additionally, the cost of the land, which had been included in the preliminary bid, was not incorporated into these final bids. Even though Francois suggested the final cost could be reduced by $50,000 with several design changes, the owner terminated his relationship with Francois and met

with JRQH.  The owner presented JRQH with a copy of the proposed building drawings prepared by Francois, and construction began.  When Francois learned that the building plans he had prepared for the client were being used by JRQH in the construction, he brought suit against JRQH alleging, *inter alia*, a Lanham Act violation.

Francois' Lanham Act claim alleged that JRQH (or someone at its direction) copied the original plans and then revised and submitted them without recognizing Francois as the original creator.  Id. at *12.  Relying on Dastar, the court rejected this argument.  Id. at *12–13.  The court held that where a claim is based on copying, revising, and using a copyrighted work, the proper remedy is found in copyright law.  Id. at 13.  Though the defendants may have used Francois' drawings, the defendants became the origin of the materials when they were resubmitted with the defendants' name on them.

Similarly here, Barefoot's Lanham Act claim fails as a matter of law.  Under the reasoning set forth in Dastar, Roberts (and/or Springline) is the "origin" of the architectural drawings in question.  The documents bore Roberts and Springline's names and had Roberts' architect seal on them.  Roberts sent a letter to the VIDPNR specifically identifying herself as the architect replacing Milne on the project and that she would be submitting new permit drawings.  There is no dispute that under the Dastar analysis, Roberts and Springline are the originators of the drawings.

Even assuming Roberts and Springline copied Barefoot's drawings, there is neither

proof nor allegation they simply copied the materials and resubmitted them as their own.

See Dastar, 539 U.S. at 31 ("[Plaintiff's Lanham Act] claim would undoubtedly be sustained if Dastar had bought some of . . . [the original] videotapes and merely repackaged them as its own.").  On the contrary, there is sufficient evidence on the record showing Springline's drawings were *revised* copies of Barefoot's drawings.  My review of the Barefoot's and Springline's architectural drawings has not uncovered blatant, unadorned copying between the sets.  Rather, Barefoot's own architectural expert, Richard Cook, notes similarities but also indicates the presence of certain distinctions between the designs. (See e.g., Aff. Of Richard Cook ¶¶ 9 –23.)

Barefoot counter-argues that (1) the defendants have waived their argument by failing to raise the affirmative defense of preemption, and (2) Dastar does not apply to this action.  Neither argument compels a different result here.

First, the claim that the defendants have waived the affirmative defense of preemption is confusing and misguided. Barefoot believes the defendants have waited too long to present Dastar's holding to the court, and this "delay" bars them from raising it now.  This argument may be valid if preemption was being raised as an affirmative defense.  On the contrary, the defendants argue the Dastar ruling bars the interpretation of the Lanham Act proposed by Barefoot, not that it has any pre-emptive effect on applicable law.

The argument that Dastar does not apply is also easily dismissed.  Under Dastar,

the concept of "origin" refers only to the physical good itself. Outside of a situation where the good offered is merely an unrevised carbon copy of an already existing product, use of the *contents* of such a product is not prohibited by the Lanham Act. Barefoot does not allege Roberts and Springline simply provided carbon copies of its own drawings. It has instead provided numerous examples of where it believed there was substantial similarity between the drawings, but falls distinctly short of the alleging the set of facts the Court alluded to in <u>Dastar</u>. Absent blatant copying of any similar attempt to pass off the unadorned or unaltered product of a competitor, <u>Dastar</u> compels finding that the producer of the product in question is the origin of that good. Consequently, pursuant to this holding, I will grant the motion as to this claim and dismiss it.

### D. Breach of contract

I will dismiss this claim. As it was likely brought under the court's authority to exercise supplemental jurisdiction, the claim, as presented in the complaint, provides no independent basis of original jurisdiction.

### 1. Failure to state a basis for jurisdiction

As a preliminary matter, Barefoot's failure to state formally that the breach of contract claim is being brought as a supplemental claim is not fatal. Original jurisdiction was properly based on the federal copyright and Lanham Act claims. 28 U.S.C. § 1331. This state law claim required an additional basis of jurisdiction. In its summary judgment reply memorandum, Barefoot attempted for the first time to invoke supplemental

jurisdiction, as contained in 28 U.S.C. § 1367. This, however, is far too late to remedy the fatal failure contained in the complaint itself.

## 2. Discretion to decline to exercise supplemental jurisdiction

Where the court has dismissed all claims over which it has original jurisdiction, the court has discretionary authority to decline to exercise supplemental jurisdiction over any remaining claims. 28 U.S.C. § 1367(c). The statute does not provide further explanation on when and how to exercise jurisdiction in these situations, but the Third Circuit has stated, "[W]here the claim over which the district court has original jurisdiction is dismissed before trial, the district court must decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so." Borough of West Mifflin v. Lancaster, 45 F.3d 780, 788 (3d Cir. 1995); see also Markowitz v. Northeast Land Co., 906 F.2d 100, 106 (3d Cir. 1990); Annulli v. Panikkar, 200 F.3d 189, 202 (3d Cir. 1999); Gannon v. Nat'l R.R. Passenger Corp., 422 F. Supp. 2d 504, 513 (E.D. Pa. 2006); Wheeler v. City of Philadelphia, 367 F. Supp. 2d 737, 748–49 (E.D. Pa. 2005); Louis Dolente & Sons v. U.S. Fid. and Guar. Corp., 252 F. Supp. 2d 178, 185 (E.D. Pa. 2003).

Consideration of judicial economy favors dismissing the claim. The court has expended almost no resources on this breach of contract claim. The previously addressed motions to strike and the current motion for summary judgment are the first instances where the parties have engaged the court in the substantive dispute of the claim.

Additionally, a state court judge is not likely to have to expend a great deal of effort to prepare himself or herself for this case because the claim involves issues of contract interpretation. Resolution of the federal claims here have no bearing on the breach of contract claim, and the general factual background can be gleaned from either the parties' extensive statements of material facts and from this court's opinions.

The factor of convenience is neutral. This case was brought in the United State District Court for the District of the Virgin Islands. If the court opts to dismiss the claims pursuant to § 1367, the plaintiff could bring suit in the Superior Court of the Virgin Islands. In either situation, the parties will still be proceeding in a courthouse located in the Virgin Islands.

Admittedly, this matter has been pending for a number of years, and the parties have a genuine interest in resolving the litigation. However, the Court is compelled to consider the factors of judicial economy and convenience. Weighing the relevant factors in balance, I do not believe there is a compelling reason for retaining jurisdiction. Perhaps most importantly, neither party has raised compelling reasons for retaining jurisdiction.

## IV. Conclusion

For the foregoing reasons, I will grant the motions for summary judgment as to Counts I and II and dismiss Count III pursuant to the grant of discretion contained in 28 U.S.C. § 1367(c). An appropriate order follows.